United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 10, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 04-30418

THYSSEN, INC.,

Plaintiff-Appellant,

versus

NOBILITY MV, ETC.; ET AL,

Defendants,

NATIONAL UNION FIRE INSURANCE COMPANY OF LOUISIANA;
FENICE MARITIME LTD.,

Defendants-Appellees

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

No. 04-30453

THYSSEN INC.,

Plaintiff-Appellant,

versus

NOBILITY MV, ETC.; ET AL,

Defendants,

FENICE MARITIME LTD.,

Claimant-Appellee.

Appeal from the United States District Court
For the Eastern District of Louisiana

Before BARKSDALE, DeMOSS, and PRADO, Circuit Judges.

DeMOSS, Circuit Judge:

Plaintiff-Appellant Thyssen, Inc. ("Thyssen") appeals both from the district court's order granting Defendant-Appellee National Union Fire Insurance Co. of Louisiana's ("National Union") motion for involuntary dismissal and from the court's judgment in favor of Defendant-Appellee Fenice Maritime Ltd. ("Fenice"). For the following reasons, we AFFIRM.

## BACKGROUND

This case involves the carriage of 243 cold-rolled steel coils (the "coils" or the "cargo") aboard Fenice's vessel, the MV NOBILITY (the "NOBILITY"). Thyssen purchaded the coils for resale to its customer CP Louisiana. The NOBILITY left Rio de Janeiro, Brazil, in February 2001 and arrived in New Orleans, Louisiana, in April 2001. The cargo was carried under bills of lading CPERNO105RINO007 and CPERNO105RINO008.

Fenice time chartered[1] the vessel to Clipper Bulk Shipping, Ltd. and/or Bossclip, Ltd., which in turn voyage chartered[2] the

---

[1]A time charter is a contract whereby a vessel is let to a charterer for a stipulated period, in exchange for a remuneration known as hire – a monthly rate per ton deadweight or a daily rate. The charterer is free to employ the vessel as it thinks fit within the terms as agreed, but the shipowner continues to manage his own vessel through the master and crew who remain his servants.

[2]A voyage charter is a contract under which the shipowner agrees to carry an agreed quantity of cargo from a specified port or ports to another port or ports for a remuneration called freight, which is calculated according to the quantity of cargo loaded, or sometimes at a lumpsum freight.

ship to CSC Cayman Ltd., the manufacturer of the coils. The voyage charter was dated February 19, 2001, and was specifically incorporated into the bills of lading. The terms of carriage for Thyssen's cargo were "Free In Out Stowed."[3] The NOBILITY carried other cargo, including tin plates for discharge in New Orleans on behalf of another cargo shipper; the terms of carriage for the tin plates were "Free In Stowed Liner Out."[4]

Pennant Shipping ("Pennant"), Fenice's New Orleans agent, selected the Chalmette Slip as the NOBILITY's discharge wharf and contacted Stafford & Stillwell Stevedoring, Inc. ("S & S") to discharge the cargo. Thyssen was notified of the discharge location and that S & S would perform the discharge; Thyssen received a rate and terms quotation from S & S, which it accepted. Shortly after the vessel arrived in New Orleans on or about April 6, 2001, the cargo was examined while it was still stowed aboard the NOBILITY. Condensation and rust scale were noted, and Thyssen originally lodged a possible water damage claim with the NOBILITY. During subsequent, follow-up surveys to examine the coils for possible rust damage, all attending surveyors noted handling damages due to the negligence of the discharging stevedore, S & S.

---

[3]"Free Out" cargo is discharged at the risk and expense of the cargo interests.

[4]"Liner Out" cargo is discharged at the risk and expense of the vessel interests and thus is generally charged to shippers at a higher rate.

3

CP Louisiana rejected the coils.

Thyssen filed suit *in rem* against the NOBILITY on April 9, 2001, in district court and simultaneously moved to arrest the vessel. The vessel was arrested and then released pursuant to bond filed by Fenice, which also filed a claim to the vessel and undertook its defense. Fenice filed an answer on December 5, 2001.

On January 8, 2002, Thyssen filed its first supplemental and amended complaint, adding S & S as an additional defendant. Fenice filed a cross-claim against S & S on February 22, 2002. S & S failed to respond to service, so the summons and complaint were reissued on July 3, 2002. S & S continued to fail to appear; Thyssen moved for a default against S & S on August 29, 2002; and the clerk entered the default on September 5, 2002.

On May 29, 2003, Thyssen moved for a default judgment against S & S. The district court scheduled Thyssen's motion for default judgment against S & S for hearing on June 17, 2003. At the hearing, Thyssen submitted testimony from its surveyor, Stan Janak ("Janak"), plus exhibits. S & S was not represented by counsel at the hearing. The court granted Thyssen's motion and rendered a default judgment against S & S for damages in the amount of $160,696.28.

Immediately prior to the hearing, the parties deposed the president of S & S, Tony Stafford ("Stafford"), and learned the identity of S & S's insurance broker, USI Gulf Coast, Inc. ("USI

4

Gulf"). Thyssen ultimately learned that S & S was insured by National Union under a comprehensive marine liability policy. The insurance policy obligated S & S to provide National Union timely notice of any occurrences and claims against S & S that could potentially be covered by the policy.

On June 26, 2003, Thyssen presented its damages claim to USI Gulf, which in turn faxed the claim to National Union on July 17, 2003. National Union advised that it intended to deny coverage based on late notice. On August 19, 2003, Thyssen filed for leave to file its second supplemental and amended complaint to name National Union as a defendant pursuant to the Louisiana Direct Action Statute ("LDAS"), LA. REV. STAT. ANN. § 22:655.[5] The district court continued the trial on August 29, 2003.

National Union answered Thyssen's original and amended complaints on October 28, 2003. Fenice filed a summary judgment motion on January 13, 2004, which Thyssen opposed; the motion was reserved for trial on the merits. National Union filed a summary

---

[5]The LDAS provides, in relevant part:

The injured person or his or her survivors or heirs . . ., at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and, such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Code of Civil Procedure Art. 42 only.

LA. REV. STAT. ANN. § 22:655(B)(1).

judgment motion on February 9, 2004, which both Thyssen and Fenice opposed; this motion was denied. On March 2, 2004, Fenice filed a motion to dismiss its cross-claim against S & S with prejudice.

The case proceeded to bench trial on March 22-23, 2004. The district court granted National Union's motion for involuntary dismissal at the close of Thyssen's case, finding that National Union was prejudiced by the late notice. Thyssen and Fenice filed post-trial memoranda on April 2, 2004. On April 23, 2004, the district court ruled from the bench and dismissed Thyssen's claim against Fenice. The court concluded Fenice was exonerated from responsibility for the damage under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.* Alternatively, the court concluded even if the Harter Act, 46 U.S.C. § 190 *et seq.*, applied, Fenice was exonerated. Thyssen timely appealed, and the appeals were consolidated.

## DISCUSSION

The district court's factual findings are subject to review for clear error. *Folger Coffee Co. v. Olivebank*, 201 F.3d 632, 635 (5th Cir. 2000); *Sabah Shipyard Sdn. Bhd. v. M/V HARBEL TAPPER*, 178 F.3d 400, 404 (5th Cir. 1999). "In admiralty cases tried by the district court without a jury, we review the district court's legal conclusions *de novo*." *Sabah Shipyard*, 178 F.3d at 404.

**Whether the district court erred in granting National Union's motion for involuntary dismissal.**

6

In ***West v. Monroe Bakery, Inc.***, 46 So. 2d 122 (La. 1950), the Louisiana Supreme Court held that where an injured third person is not at fault, he does not lose his right or cause of action under the LDAS where the insured breached a notice provision in the policy with its insurer. ***Id.*** at 129-130. The ***West*** court stated, after explaining the difficulties often faced by injured third parties, which rarely have knowledge of the insurer of the negligent party, in providing notice to the insurer: "It is not desirable that [the third party] should be divested of such action, and that result should not obtain *except in a very clear case*. This is not such a case." ***Id.*** at 130 (emphasis added). "The ***West*** court did not address this issue, but it did by implication recognize that if the insurer showed prejudice to an adequate level, it could escape liability." ***Auster Oil & Gas, Inc. v. Stream***, 891 F.2d 570, 579 (5th Cir. 1990).

In ***Pomares v. Kansas City Southern Railway Co.***, 474 So. 2d 976 (La. Ct. App. 1985), the Fifth Circuit Court of Appeal of Louisiana relied on ***West*** to reject the insurer's argument that it could escape liability to a third party under the LDAS because it did not receive notice of the suit until the third party attempted to execute the judgment by garnishment against the policy. 474 So. 2d at 978. The ***Pomares*** court held that "the jurisprudence dealing with such notice provisions establishes that an insurer may not raise the *nonprejudicial* failure of the insured to give proper

7

notice of suit as a defense to valid claims by a third party." *Id.*
(citing, amongst others, *West*) (emphasis added).  Because the
insurer "neither alleged nor show[ed] any prejudice resulting to it
by the lack of notice," the *Pomares* court found the insurer could
not deny coverage based on late notice. *Id.*  The court noted in
particular that the insured "was represented by counsel during the
tort suit" brought by the injured third party.  *Id.*

This Court has interpreted Louisiana law on late notice in the
context of the LDAS, "as presented in both *Pomares* and *West*," to
mean that "the insurer can defend successfully against the third
party *only if it can demonstrate prejudice* from the insured's
failure to comply with the policies' notice provisions." *Auster
Oil*, 891 F.2d at 579 (emphasis added).  We restated this standard
in *Jackson v. Transportation Leasing Co.*, 893 F.2d 794 (5th Cir.
1990)(per curiam):

> [W]here through the Louisiana Direct Action statute, La.
> Rev.Stat.Ann. 22:655, an injured third party directly
> sues the insurer, the third party does not lose his cause
> of action due to the insured's breach of the notice
> provisions of the policy.  The insurer can defend
> successfully against the third party *only if it can
> demonstrate prejudice* from the insured's failure to
> comply with the policy's notice provisions.

*Id.* at 795-96 (citing *Auster Oil*, 891 F.2d at 576, *West* and
*Pomares*) (emphasis added).[6]  In *Auster Oil*, we noted that "denial

---

[6]In *Jackson*, we held the insurer only needed to show late notice
and not prejudice to defeat the insureds' claim because it was the
insureds themselves, not a third party, which provided untimely

8

of the opportunity to litigate is obviously prejudicial to some extent and in certain cases may constitute prejudice as a matter of law." 891 F.2d at 579. However, this Court determined in *Auster Oil* that the district court erred in granting the insurer summary judgment based on lack of notice without requiring the insurer to prove sufficient prejudice to defeat the third party's LDAS claim. *Id.* (remanding where genuine fact issues regarding prejudice were raised). There, evidence was presented that the insurer would not have defended the insured even if it had been timely notified and would have denied coverage. *Id.* Also, the insured was otherwise "represented fully and effectively at trial." *Id.* Moreover, the damages portion of the underlying suit had been remanded and had "yet to be tried." *Id.*

The relevant provisions in S & S's policy with National Union regarding S & S's obligations to provide National Union with timely notice of occurrences and claims under the policy state:

9.  NOTICE OF OCCURRENCE

Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involved injuries or damages which in the event that the Assured should be held liable, is likely to involve this Policy, notice shall be sent to:

---

notice and then sued their insurer for coverage of the damages against them in the underlying suit. 893 F.2d at 795-96 (discussing *Auster Oil*'s reconciliation of Louisiana late notice law – comparing the line of cases where the insured sued its insurer, not requiring prejudice to defeat the insured's claim, with the line of cases where an injured third party sued the insurer, requiring prejudice to defeat the direct action claim).

USI Gulf Coast, Inc.
[mailing address]

as soon as practicable, provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.
. . .

15. REPORTING OF CLAIMS: In the event of an occurrence with respect to which insurances are afforded under this Policy, written notice containing particulars sufficient to identify the Assured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of available witnesses, shall be given by or for the Assured to this Company as soon as practicable.

Thyssen first argues the district court erred by agreeing with National Union that the rendering of the default judgment against S & S constituted *ipso facto* prejudice to National Union. Thyssen maintains that entry of a default judgment alone does not create prejudice. *See* **Jackson**, 893 F.2d at 795 (adopting **Pomares**). Thyssen also contends that National Union could not have been prejudiced in its defense of a claim where S & S's own agent agreed that there was no available defense. Thyssen emphasizes that S & S was represented by its own surveyor, the firm Martin Ottoway, during the damage surveys; Martin Ottoway surmised the damage occurred precisely as had Thyssen's surveyor, as a result of S & S using improper equipment to handle the coils.

Next, Thyssen argues that occurrence policies in particular function to attach coverage and vest the injured third party with

10

rights against the insurer at the time of the tort, as evidenced by the LDAS and Louisiana's strong public policy in favor of protecting injured third parties. Thyssen contends the insured's dilatory failure to comply with notice provisions in the policy cannot defeat the third party's rights under the LDAS "except in a very clear case" because the injured party often does not have knowledge of the insurer's identity and thus cannot give notice on its own. *See* **West**, 46 So. 2d at 129-30; *see also* **Auster Oil**, 891 F.2d at 579.

Thyssen stresses National Union was not prejudiced because the time for appealing the default judgment had not run before notice was given, even though USI Gulf waited three weeks to forward the claim. Moreover, Thyssen contends National Union could have raised a Rule 60(b) motion to set aside the default judgment for good cause shown; Thyssen argues if any prejudice was suffered, it was a result of National Union's own inaction. Thyssen thus maintains National Union did not meet its burden to show a "very clear case" of adequate prejudice on the instant facts.

National Union asserts the district court was correct to find prejudice due to late notice. First, National Union reiterates that there is no dispute that S & S breached its policy obligations to provide timely notice of Thyssen's claim and that neither National Union nor USI Gulf received any notice of the occurrence, much less the suit, prior to the entry of default judgment against

11

S & S.

National Union submits that the rendering of a default judgment alone will support a finding of prejudice. *See Elrod v. P.J. St. Pierre Marine, Inc.*, 663 So. 2d 859, 864 (La. Ct. App. 1995)[7]; *Hallman v. Marquette Cas. Co.*, 149 So. 2d 131, 135 (La. Ct. App. 1963).[8]  Regardless if such rendering shows *ipso facto* prejudice, National Union argues it proved prejudice in fact and relies on its original trial arguments:  "The default judgment, no counsel, the mitigation factor, the reduction [in damages], all add up to prejudice."

National Union maintains late notice of the claim deprived it

---

[7]In *Elrod*, the third party plaintiff did not bring suit against the insurer pursuant to the LDAS, but instead attempted to enforce the default judgment against the insured by filing a petition to make the judgment executory and for garnishment.  663 So. 2d at 861.  However, the *Elrod* court, relying on *Pomares* and *West*, stated that "[t]he injured party's right to recover in both instance[s] may be defeated if the insurer can demonstrate prejudice from the insured's failure to comply with the policies' notice provisions." 663 So. 2d at 863.

[8]In *Auster Oil*, this Court rejected the conclusion in *Hallman*, that the insurer was not required to demonstrate prejudice to escape liability in an LDAS action, as contrary to the result in *Pomares*, which relied on *West*.  891 F.2d at 577.  The Fifth Circuit Court of Appeal of Louisiana in *Elrod* also discounted the rule in *Hallman* as contrary to that in *Pomares* and *West*.  663 So. 2d at 863-64.  But the *Elrod* court explained that "the result in *Hallman* is consistent" with the requirement to show prejudice from late notice because the *Hallman* court "noted the extreme prejudice to the insurer caused by the insured's failure to comply with the policy notice provisions, allowing a default judgment to be obtained by the plaintiff against the insured without knowledge of the insurer and an opportunity to furnish a defense to the claim." *Id.* at 864 n.1.

of the opportunities to promptly investigate the claim, to appoint counsel to represent S & S's interests, and to present any defense to Thyssen's claim. National Union also disputes any contention that because S & S was represented by Martin Ottaway, which conceded liability, National Union lacks any defense. National Union notes Pennant, Fenice's New Orleans agent, retained Martin Ottaway; and once a damage claim is made, the charterer and the discharging stevedore have conflicting interests.

National Union next argues there is substantial evidence supporting the district court's finding that its judgment amount "would have been somewhat, if not greatly, different than it is as a default judgment." National Union challenges the method used to determine the amount of damaged coils at the default hearing as not equitable, in that Thyssen's damage claim was premised on 100% of damaged coils (all 243) instead of the estimated 80% of cargo found to be damaged (194 coils) based on representative sample surveys: a difference in damages of almost $22,000. National Union also maintains certain of the transportation fees, surveyor's fees, and storage charges were improperly deemed to be a result of the sustained damage and would instead have been incurred even in the absence of any damage by S & S.

In addition, National Union attempts to shift some of the blame for the damage from S & S, noting that two preloading surveys indicated several of the outer covers of the coils were already bent and crimped. National Union also emphasizes Thyssen's

13

persistent claims of rust damage prior to entry of the default judgment. Moreover, National Union contends Thyssen failed to mitigate any handling damages by S & S by not stopping the discharge operations when Thyssen was informed the coils were being damaged, and then by subsequently allowing S & S to load the coils onto trucks for transfer to the inspection site.

Finally, National Union asserts Thyssen has no basis for the proposition that an insurer is required to appeal or exhaust any procedural remedy as to a default judgment against its insured before asserting late notice.

In response, Thyssen maintains that the amount of damages in the default judgment is correct; but even if it is not, this Court can cure any prejudice by reversing the district court's dismissal and either reduce the award level or remand for further proceedings to establish the proper amount of damages.

Under Louisiana law, the insurer must make a showing of adequate prejudice to defeat an action by a third party under the LDAS. *See* **Auster Oil**, 891 F.2d at 579 ("[I]f the insurer showed prejudice to an adequate level, it could escape liability."). Thus, the question here is whether the district court erred in granting National Union's motion for involuntary dismissal based on its finding that National Union showed adequate prejudice to defeat Thyssen's claim under the LDAS. Prejudice due to late notice is a factual finding subject to clear error review. *See* **Elevating**

14

*Boats, Inc. v. Gulf Coast Marine, Inc.*, 766 F.2d 195, 199 (5th Cir. 1985)[9]; *see also* **Auster Oil**, 891 F.2d at 579 (finding genuine factual issue existed as to prejudice from late notice).

No case has required procedural exhaustion by an insurer, such as appealing the default judgment or seeking to have it set aside, before a showing of prejudice can be made. Of course, this might weigh in favor of lack of prejudice. In contrast, entry of a default judgment is a strong starting basis for a claim of prejudice. *See* **Elrod**, 663 So. 2d at 864 (noting "it would be difficult to conceive of greater prejudice . . . than a demand for payment of a default judgment of which a defendant is totally ignorant") (quoting **Hallman**, 149 So. 2d at 135). The insurer's loss of opportunity to litigate the action weighs in favor of finding prejudice. *See* **Auster Oil**, 891 F.2d at 579 (noting "denial of the opportunity to litigate is obviously prejudicial to some extent"); **Elrod**, 663 So. 2d at 864 (finding sufficient prejudice where insurer did not have the opportunity to appear in the case and present a defense, which it would have done, had it known about the suit). The lack of representation by counsel of the insured defendant during the underlying suit weighs in favor of prejudice. *See* **Auster Oil**, 891 F.2d at 579 (finding fact issues on prejudice where insured was "fully and effectively" represented by counsel

---

[9]In **Elevating Boats**, the insureds themselves – not a third party under the LDAS – brought suit. 766 F.2d at 196-97.

during 42 U.S.C. § 1983 trial); *Elrod*, 663 So. 2d at 863 (noting the *Pomares* court "focused on the fact that the insured had been represented at trial by able counsel as evidence negating the existence of prejudice to the insurer"); *Pomares*, 474 So. 2d at 978 (finding lack of prejudice where insured was represented by counsel during tort suit). If damages have been tried and found, this also weighs in favor of prejudice. *See Auster Oil*, 891 F.2d at 579 (finding fact issues on prejudice where question of damages remained open).

The district court relied on the following orally given reasons to find that National Union met its burden of showing adequate prejudice due to late notice:

> With regard to the National Union motion, I think the facts which are subject to stipulation with regard to notice . . . along with the record itself and I think our discussion here with regard to at what point the plaintiff could have discerned the name of the broker, which was known to Mr. Stafford, at what point could the plaintiff have finally secured Mr. Stafford's presence at a deposition concerns me. Such that the information could have been available to the plaintiff earlier in the litigation. The default judgment, too, is problematic, based upon what I heard in the past day and a half. I think there is no doubt the stevedore, S&S Stevedores, surely bore some responsibility, if not the majority of the responsibility, for the damages that plaintiff claims, but nonetheless, looking at the facts of this case in light of the *Jackson* . . . case . . . and the other Fifth Circuit [Court of Appeal of Louisiana] cases such as *Elrod*, . . . . I don't think I can come to any other conclusions but that National Union was prejudiced to the extent that it could have provided a defense to S&S Stevedores. And as I indicated earlier, that the judgment, as it exists today, against S&S Stevedores, would have been somewhat, if not greatly, different than it is as a default judgment.

16

To the extent the district court placed part of the fault for the late notice on Thyssen, we give little credit to that as a reason in light of the strong Louisiana public policy in favor of direct actions by an injured third party.  *See* ***West***, 46 So. 2d at 129-30.

However, several other factors weigh in favor of prejudice. National Union makes persuasive arguments that it would have, with proper notice of the claim, challenged when some of the coil damage occurred (preloading and/or onboard versus discharge); whether the damage was entirely caused by S & S; and the method by which damages were calculated.  Moreover, National Union makes cogent arguments that S & S was neither adequately represented by Martin Ottaway nor represented at all by counsel at the default judgment hearing, and that Thyssen had the ability to but did not mitigate some of the damage.  There was no evidence that National Union would have refused to defend or denied coverage to S & S under the policy.  Also, the default judgment addressed the issue of damages. Thus, we conclude that the district court did not commit clear error in finding National Union's situation reached the level of adequate prejudice.

**Whether the district court erred in dismissing Thyssen's *in rem* claim against the NOBILITY and against Fenice as vessel owner.**

The district court entered the following factual findings and conclusions of law before it dismissed Thyssen's case against the NOBILITY.  The court found the bills of lading specifically incorporated all terms and provisions of the charter party, such

17

that the coils constituted private, not common carriage.  Thus, the court determined the Harter Act did not apply.[10]  The court concluded that even if the Harter Act were to apply, § 192 absolved the vessel, her owners, agents, and charterers "for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative," 46 U.S.C. § 192, because the damage to the coils resulted from the negligence of Thyssen's agent, S & S. The court found that Thyssen negotiated with S & S and entered into a contract with it to discharge the cargo.

Moreover, the district court found that while COGSA did not apply of its own force, the Clause Paramount contained in rider clause 28 of the incorporated voyage charter made COGSA applicable to this cargo.  Subsection 1304(2)(i) of COGSA provides immunity for the carrier and ship for an "[a]ct or omission of the shipper or owner of the goods, his agent or representative"; and subsection 1304(2)(q) provides immunity where the carrier can show "[a]ny other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier."  46 U.S.C. § 1304(2)(i) and (q).  Thus, the court determined that the vessel was entitled to exoneration for the damage to the coils.

---

[10]The Harter Act makes it unlawful for a bill of lading to contain language relieving the vessel from liability "for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery" of the cargo. 46 U.S.C. § 190.

18

The district court noted that whether the Harter Act or COGSA applied, both acts were intended to prevent the carrier from being exonerated from the carrier's own fault, or the fault of the carrier's agents or employees. However, the acts never intended to shift the responsibility to a carrier for the negligence of an agent, employee, or contractor of the cargo owner. Also, the court noted that while the Harter Act imposes obligations on the carrier until delivery of the cargo, delivery can be "actual" or "constructive." Here, the court found actual delivery occurred when Thyssen's agent S & S obtained possession of the cargo. The court concluded any negligence occurred some distance from the vessel during handling by the stevedore hired and paid by Thyssen, without any involvement of the vessel, her agents, or employees.

First, Thyssen argues that the district court erred by applying COGSA after the discharge of the coils, such that the NOBILITY was exonerated from liability by virtue of COGSA subsections (i) and (q). Thyssen insists that although COGSA supplanted certain parts of the Harter Act, it did not repeal it. Because COGSA applies to "contracts of carriage," which include "any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party," 46 U.S.C. § 1301(b), Thyssen argues COGSA applied before discharge, but the Harter Act applied after. Thus, because the damage occurred post-discharge and before delivery, Thyssen maintains the Harter Act controls.

Under the Harter Act, Thyssen contends the properly liable

19

party is the common carrier, subject to any proven defenses such as acts of God, war, or public enemy. *See* ***Liverpool & G. W. Steam Co. v. Phenix Ins. Co.***, 129 U.S. 397, 437 (1889).[11] Thyssen stresses the district court's failure to apply the Harter Act stems from its error in determining this was a case of private, not common, carriage. Because the NOBILITY carried cargo for various shippers, Thyssen contends this means it held itself "out to the general public as engaged in the business of marine transport for compensation," 1 THOMAS J. SCHOEMBAUM, ADMIRALTY AND MARITIME LAW § 10-3, at 587 (4th ed. 2004) (citations omitted). Thyssen insists multiple shipping defeats any indication of private carriage that a bill of lading incorporating the terms of the voyage charter may connote.

Thus, according to Thyssen, under the Harter Act, the vessel could not delegate its duty to make proper delivery. Thyssen argues this duty required the carrier to place the cargo upon a fit and proper wharf at the port of destination; segregate it by bill of lading; put it in a place of rest (here, the Chalmette warehouse) accessible to the consignee; and afford the consignee a reasonable opportunity to retrieve it. *See* ***F.J. Walker, Ltd. v. Motor Vessel LEMONCORE***, 561 F.2d 1138, 1142 (5th Cir. 1977). Thyssen contends the lack of enclosed storage and improper

---

[11]We note this case was decided before the Harter Act was passed in 1893.

20

forklifts at the Chalmette Slip rendered the wharf unfit and made the damage virtually inevitable.

Moreover, Thyssen maintains the district court erred in finding that even if the Harter Act applied, the carriers would still not have liability because S & S was Thyssen's agent and thus the loss resulted from an act of the owner of the goods. That is, the act of shipper defense under § 192 of the Harter Act negated the vessel's liability. Thyssen points to what it characterizes as overwhelming and uncontradicted evidence that the carrier chose S & S and the Chalmette Slip and (because the "Liner Out" cargo outweighed the "Free Out" cargo) controlled and directed the discharge. Thyssen asserts it is not enough that it paid S & S; this did not relieve the carrier of its duty to make proper delivery. *See* **Caterpillar Overseas, S.A. v. S.S. Expeditor**, 318 F.2d 720, 723 (2d Cir. 1963) (noting that cost allocation does not affect the duty of proper delivery). Thus, Thyssen argues S & S was the carrier's, not its, agent. Thyssen insists only where a carrier suffers a breakdown of law and order that prevents it from fulfilling its duty to make proper delivery can it be exonerated. *See, e.g.,* **Tapco Nigeria, Ltd. v. M/V WESTWIND**, 702 F.2d 1252, 1259-60 (5th Cir. 1983).

In response, Fenice argues the district court correctly concluded that this carriage, pursuant to bills of lading clearly incorporating charter parties and thereby COGSA, was private,

making the Harter Act inapplicable.  *See, e.g., **Kerr-McGee Corp. v. Law***, 479 F.2d 61, 64 (4th Cir. 1973); ***In re MARINE SULPHUR QUEEN***, 460 F.2d 89, 102-03 (2d Cir. 1972).  Fenice contends this can be no surprise to the huge conglomerate Thyssen, which was aware that the coils would ship on a vessel subject to charter parties and would be carried on a "Free Out" basis.  Fenice maintains the Harter Act only applies to the context in which it was passed in 1893 – where large vessels provided common shipping for small, individual shippers which had no bargaining power and little ability to negotiate private carriage of their goods pursuant to charter parties.

Next, Fenice contends the district court correctly found that the discharge of the coils was effected by S & S, which stevedore was selected, paid, and controlled by Thyssen, thus exonerating the vessel from responsibility under § 192 of the Harter Act and/or under COGSA subsections (i) and (q).  Fenice challenges Thyssen's argument that it was forced to agree to use S & S.  Fenice points to the cross-examination of Thyssen's logistics director, Simon Golding ("Golding"), who admitted Thyssen had the obligation to discharge the coils because they were "Free Out."  Golding also stated nothing in writing took away Thyssen's ability to choose its own stevedore, and Thyssen never asked to use its own chosen stevedore.  Thyssen accepted the quote from S & S; and Golding stated that if Thyssen had used a different stevedore, the price

22

likely would have been "more costly." Moreover, other testimony indicated that S & S did not have an exclusive lease at Chalmette Slip, meaning a different stevedore could have been selected, and that frequently multiple stevedores can discharge cargo from one vessel without any problem. Also, Janak confirmed only Thyssen had the right to suspend the discharge operations.

Fenice argues even if the Harter Act were to apply, the damage here was indisputably caused by Thyssen's own agent, S & S; and § 192 specifically exempts the carrier from such liability. Fenice insists that to rule otherwise would allow a cargo interest to recover for damages caused by its own agent or employee. Fenice agrees with Thyssen's characterization of the proposition in **Caterpillar Overseas** that the duty of proper delivery is not affected by the allocation of costs between the carrier and the shipper. *See* 318 F.2d at 724 (placing liability on carrier for damage effected by its chosen lighter under its control where shipper paid for lighterage). However, Fenice argues that here the cargo damage occurred as a result of mishandling by a shipper-controlled stevedore after discharge from the vessel, when the cargo was far removed from and beyond Fenice's control.

Next, Fenice maintains that COGSA, incorporated in rider clause 28 of the voyage charter here, also exonerates the vessel under § 1304(2)(i) and (q). Fenice relies on caselaw also cited by the district court – **Tubacex, Inc. v. M/V RISAN**, 45 F.3d 951, 956

23

(5th Cir. 1995), and *Sigri Carbon Corp. v. Lykes Brothers Steamship Co., Inc.*, 655 F. Supp. 1435, 1437-38 (W.D. Ky. 1987) – for the proposition that for "Free In" and "Free Out" cargo, the vessel carries no liability for cargo damage that is caused by a stevedore controlled by the shipper.

Finally, Fenice responds to Thyssen's contention that the district court erred in finding actual delivery of the coils under the Harter Act occurred when S & S took possession. Fenice agrees that the Harter Act extends not just to discharge, but also to delivery; however, Fenice contends that delivery and discharge can occur simultaneously when the goods are discharged into the custody of the shipper or its agent. S & S received the coils on behalf of its principal Thyssen – thus, according to Fenice, actual delivery occurred at that time. *See Farrell Lines Inc. v. Highlands Ins. Co.*, 696 F.2d 28, 30 (2d Cir. 1982). Fenice also argues that constructive delivery under the Harter Act, the only theory requiring a fit wharf, was also accomplished here before damage occurred. Thyssen was aware of the arrival of the coils and had its surveyor meet the vessel before discharge occurred. Thyssen's own stevedore discharged and segregated its coils, and the coils were placed on a wharf that did not crumble or drop the cargo into the water. Fenice notes only negligent stevedoring caused the damage, not any unfit condition of the wharf or because the coils were not immediately placed into a warehouse. Fenice points to

24

testimony supporting the theory that competent stevedores should be able to move coils multiple times without damaging them.

First, we find the district court did not err in its determination that the NOBILITY was engaged in private carriage of the coils. As one admiralty treatise explains:

> The law of private carriage, now primarily charter parties, . . . is still governed by the principle of freedom of contract. Nevertheless, even in private carriage the parties may agree that the statute will govern their rights and duties. This is typically done by incorporating COGSA into a charter party by a Clause Paramount.

1 SCHOEMBAUM, ADMIRALTY AND MARITIME LAW § 10-3, at 589 (citations omitted). Thyssen's cargo was being carried subject to a voyage charter, which incorporated COGSA by a Clause Paramount. Thus, COGSA, not the Harter Act, applied. *See **Marine Sulphur Queen***, 460 F.2d at 102-03 (explaining the Harter Act does not apply to private carriage and charter party must specifically incorporate COGSA for it to apply).

Next, we consider whether the district court erred in finding S & S was Thyssen's agent, not Fenice's, such that the virtually identical exoneration provisions under either the Harter Act or COGSA applied to shift liability to Thyssen. Under ***Caterpillar Overseas***, ***Tubacex***, and ***Sigri***, the main inquiry to determine liability is which party controlled the negligent stevedore that caused the damage.

As the coils were subject to "Free Out," the presumption is

25

that Thyssen would determine the method and purveyor of discharge. Although Thyssen persistently alleges that it was powerless to choose the stevedore and the carrier had ultimate control, the testimony cited by Fenice belies this:  there was no contract provision stating Thyssen could not choose its stevedore, and Thyssen's own surveyor stated Thyssen was the only entity which could have ordered S & S to stop the discharge.  Finally, we agree with the district court that actual delivery of the coils here occurred when S & S commenced the discharge process, such that Fenice was no longer in control of the cargo.  *See* **Farrell Lines**, 696 F.2d at 30 (determining when control is relinquished and risk passes to constitute time of delivery).  Thus, the district court did not err in its determination that S & S was acting as Thyssen's agent, not Fenice's, when the damage to the coils occurred.

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and arguments, for the reasons set forth above, we AFFIRM the district court's order granting National Union's motion for involuntary dismissal and the court's judgment in favor of Fenice.

**AFFIRMED.**

26