# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 19, 2014

No. 12-30668

Lyle W. Cayce
Clerk

PT. JAWAMANIS RAFINASI; XL SPECIALTY INSURANCE COMPANY,

Plaintiffs–Appellees

v.

COASTAL CARGO COMPANY, INCORPORATED,

Defendant–Third Party Plaintiff–Appellant

v.

BABCOCK & WILCOX POWER GENERATION GROUP, INCORPORATED,
formerly known as Babcock & Wilcox Company,

Third Party Defendant–Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
(2:09-CV-7490)

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

The panel issued the original opinion in this case on July 24, 2013. *Rafinasi v. Coastal Cargo Co.*, 2013 U.S. App. LEXIS 15046 (5th Cir. July 24,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30668

2013) (unpublished). We GRANT the petition for panel rehearing, withdraw our previous opinion, and substitute the following.

This dispute focuses on damage to a boiler that occurred while the boiler was being loaded onto a ship. Before trial, the parties resolved all issues of liability and damages. They stipulated that only two issues remained for the district court to consider: (1) whether the stevedore company that negligently damaged the boiler could limit its liability under the Carriage of Goods at Sea Act ("COGSA"); and (2) whether the boiler's manufacturer was liable in whole or in part for the boiler's damage. The district court determined that the stevedore company was solely liable for damaging the boiler and that the stevedore company could not limit its liability. Only the limitation of liability issue was appealed. For the reasons that follow, we affirm the district court.

## I.

In November 2008, a boiler unit was manufactured for Plaintiff–Appellee Pt. Jawamanis Rafinasi ("Rafinasi"), an Indonesian company. The boiler was shipped to Defendant–Third Party Plaintiff–Appellant Coastal Cargo Company, Inc. ("Coastal") in New Orleans, Louisiana, where Coastal would load it onto a vessel owned by Rickmers-Linie ("Rickmers") and ship it to Rafinasi in Indonesia.

Coastal had two specific roles with respect to the boiler. First, Rafinasi's agent, ATS International, retained Coastal to unload the boiler from the manufacturer's railcar, store the boiler until Rickmers's vessel arrived, and then move the boiler shipside for loading. Second, Coastal also had an existing contract with Rickmers to serve as its exclusive stevedore in New Orleans.

The boiler itself was extremely large and unwieldy. It weighed approximately 143,300 pounds and was heavier on one side than the other. Due to its size and asymmetrical distribution of weight, transporting the boiler necessitated the use of large cement counterweights. When the boiler arrived

2

No. 12-30668

at Coastal's facilities, Coastal employees immediately realized that the boiler was heavier on one side than the other because of the presence of counterweights and the location of the lifting lugs. In light of the boiler's size and weight distribution, Coastal employees used the largest trailer they had. They positioned the trailer so that it could be driven in a straight line to the storage location because Coastal's employees, including its operations manager, believed that the boiler might fall off the trailer if the truck had to make any turns. The boiler was successfully offloaded from the manufacturer's railcar and driven to its storage location to await the arrival of Rickmers's vessel.

On December 1, 2008, Rickmers's vessel arrived at the wharf to receive the boiler. Ronald Rose ("Rose") was the vessel's port captain that day. He was charged with planning how to load the boiler, working with Coastal to ensure they understood the plan, and acting as the liaison between Coastal and the vessel's crew to ensure the boiler was loaded in a safe and correct manner. After Rose indicated that he was ready to load the boiler, Coastal's employee successfully drove the trailer in a straight line until it was alongside the ship. However, Rose did not believe that the boiler could be loaded onto his ship from its current position because the boiler's lifting points were too far away. Rose testified that he instructed Coastal's employees to bring the boiler to a point where he could reach it because otherwise he could not lift it. Rose further testified that he did not instruct them how to achieve that result. Conversely, Coastal's ship superintendent, Gabe Swenson ("Swenson"), testified that Rose instructed him to have the boiler turned around. In either event, Coastal's driver turned the truck away from the vessel and, in doing so, the boiler fell from the trailer and sustained significant damage.

Rafinasi and its insurance company, XL Specialty Insurance Company, (collectively "Plaintiffs") filed suit against Coastal on December 1, 2009, alleging that Coastal's negligence caused the boiler's damage, and that Coastal was liable

3

No. 12-30668

for breach of warranty and contract. Plaintiffs sought $284,415 in damages, as well as fees, interest, and costs. On December 16, 2010, Coastal filed a third-party complaint, claiming that the manufacturer's conduct contributed to the boiler's damage. At a pretrial conference, the parties indicated that they had resolved all outstanding issues except for two specific disputes: (1) whether COGSA limited Coastal's liability to Plaintiffs, and (2) whether the manufacturer was liable for negligently causing or contributing to the boiler's damage. They submitted briefs, evidence, and joint deposition testimony so that the district court could resolve these claims without a full bench trial. The district court determined that COGSA did not limit Coastal's liability because Coastal was not an agent of Rickmers when the boiler was damaged. The district court also found that Coastal was solely liable for damaging the boiler. Coastal timely appealed and challenges the district court's COGSA determination on two separate grounds.

## II.

As this is a direct appeal from the final decision of the district court, we have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

## A.

A district court's factual findings are reviewed for clear error, while its legal conclusions are reviewed de novo. *Thyssen, Inc. v. NOBILITY MV*, 421 F.3d 295, 299 (5th Cir. 2005). "A finding is clearly erroneous when the appellate court, viewing the evidence in its entirety, is left with the definite and firm conviction that a mistake has been made." *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 376 (5th Cir. 2012) (citation and internal quotation marks omitted). Put differently, the district court's finding is not clearly erroneous where the finding is "plausible in light of the record as a whole, even if this court would have weighed the evidence differently." *Id.* at 376–77

4

No. 12-30668

(citation and internal quotation marks omitted). The existence of an agency relationship is a question of fact which we review for clear error. *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 226 (5th Cir. 1999) (citing *Equilease v. M/V Sampson*, 756 F.2d 357, 363 (5th Cir. 1985) (en banc)).

**B**.

Coastal's first ground for appeal concerns the application of COGSA with respect to Rickmers's bill of lading. "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 18–19 (2004). COGSA governs a bill of lading for the carriage of goods from the time the goods are loaded onto the ship to the time the goods are discharged from the ship. *Id.* at 29 (citation omitted). Rickmers's bill of lading extended the COGSA governing time period to "before the Goods are loaded on or after they are discharged from the vessel" so long as the "Goods at said time are in the actual custody of the Carrier or any Servant or Agent." Relevant here, COGSA contains a "package limitation" that limits the liability of carriers for loss of or damage to goods being shipped overseas. *See Tradearbed Inc. v. W. Bulk Carriers K/S*, 374 F. App'x 464, 472–73 (5th Cir. 2010) (per curiam) (unpublished). Rickmers's bill of lading extended the package limitation to "agents and servants" of Rickmers. Pursuant to Rickmers's bill of lading, "Servants or Agents" include, *inter alia*, "stevedores . . . and any independent contractors employed by the Carrier in the performance of the Carriage."

Below, Coastal had the burden to demonstrate that the COGSA package limitation relieved it from liability. *See Servicios–Expoarma, C.A. v. Indus. Mar. Carriers*, 135 F.3d 984, 994 (5th Cir. 1998) ("[T]he burden rests upon the carrier of goods by sea to bring himself within any exception relieving him from the

5

liability which the law otherwise imposes on him." (alteration in original) (citation and internal quotation marks omitted)). Coastal therefore had to demonstrate that it was an agent of Rickmers's at the time the boiler was damaged in order to avail itself of the package limitation in Rickmers's bill of lading. To determine whether a negligent stevedore was acting as the agent of the shipper or carrier, "we look to general principles of agency law . . . and consider the roles of the parties in the transactions." *Lake Charles Stevedores*, 199 F.3d at 226 (citations and internal quotation marks omitted). In this regard, the "main inquiry to determine liability is which party controlled the negligent stevedore that caused the damage." *Thyssen*, 421 F.3d at 307.

In finding whether any agency relationship existed at the time of the accident, the district court relied upon nine considerations of fact:

> (1) Under Rafinasi's contract with the manufacturer, Rafinasi was responsible for the loading and transhipment of the boiler once it was delivered to New Orleans;
>
> (2) Rafinasi retained ATS for terminal handling and port labor regarding the boiler;
>
> (3) Coastal invoiced ATS for terminal handling of the boiler;
>
> (4) Coastal and Rickmers entered into a contract whereby Coastal served as Rickmers's exclusive stevedore for all of Rickmers's New Orleans operations;
>
> (5) Rickmers's booking note stated that Rickmers's boiler-related responsibilities were "FLT H/H (hook to hook)" (i.e. restricted to the time at which the boiler was hooked and loaded to the time the boiler was unloaded);
>
> (6) Rafinasi was required to provide special lifting devices if needed for loading and discharge of the boiler;
>
> (7) Rickmers's vessel captain instructed Coastal that he needed the boiler closer to the vessel crane to load the boiler, but he did not direct Coastal how to move the boiler;
>
> (8) the boiler was never hooked up to the vessel cranes nor loaded onto the vessel; and

(9) Coastal's employees should not have moved the boiler in the manner they did without first consulting supervisors, and doing so was in violation of Coastal's instructions.

Based upon these facts, the district court found that Coastal was not under the control of Rickmers at the time the boiler was damaged. Rather, Coastal was fulfilling its obligation to ATS and Rafinasi to handle the boiler at the terminal, prior to loading the boiler onto the vessel and before it was subject to its stevedoring obligations to Rickmers. Therefore, according to the district court, Coastal was not acting as an agent of Rickmers and could not avail itself of the COGSA extension contained in Rickmers's bill of lading.

We address each of Coastal's arguments on appeal in turn. First, Coastal argues that Rickmers controlled Coastal's actions at the time of the accident. Relying upon the testimony of Swenson, Coastal contends that Rickmers' port captain, Rose, "instructed Swenson to have the boiler turned around, or it could not be loaded." Coastal further contends that Swenson did not argue with Rose because Rose was Coastal's customer and because, in Swenson's experience, "Rose was not someone to argue with." According to Coastal, this testimony "was unimpeached, uncontradicted and completely consistent among all witnesses."

Our review of the record reveals otherwise. Rose testified that he told Coastal to "either bring it alongside w[h]ere I can reach it or I can't lift it." He did not, however, "tell them to go down the dock, turn around, and come back." In other words, Rose testified that he told the stevedore the "result I need"—having the lift points closer to the vessel—but not "how to accomplish [it]." Moreover, he testified that he did not "get involved in instructing Coastal as the stevedore on its operations on the dock"—including "how to move the boiler unit from the railcar to the MAFI trailer," "how to position the boiler unit on the MAFI trailer," or "how to line up the boiler unit on the MAFI trailer so

that it can be driven to a position . . . alongside the vessel"—because that is "not [his] purview." In light of Rose's testimony and the record as a whole, the district court's finding—that Rose instructed Coastal of his need to have the boiler closer to the vessel, but that he did not direct Coastal how to move the boiler—is plausible and thus not clearly erroneous.

Next, Coastal also argues that there are "undeniable" parallels to *Koppers Co. v. S/S DEFIANCE*, 704 F.2d 1309 (4th Cir. 1983), where the Fourth Circuit found that a negligent stevedore was acting as the carrier's agent. Specifically, Coastal asserts that, much like the stevedore–carrier relationship in *Koppers*, Coastal: (1) was performing services for Rickmers pursuant to their stevedoring contract, including terminal services; (2) invoiced Rickmers for movement of the boiler to the ship; (3) was subject to the general control and supervision of Rickmers; and (4) received from Rickmers all instructions relative to the handling of the boiler in conjunction its loading, including instructions to turn the boiler around.

Again, our review of the record demonstrates otherwise. As to Coastal's first and third point, the boiler was being shipped "FLT H/H (FLT Hook/Hook)." Therefore, Rickmers's responsibilities began once the cargo was on the hook. Because the boiler was not yet on the hook, Coastal was not yet performing services for Rickmers and, consequently, Coastal was not yet subject to the general control and supervision of Rickmers. While Coastal argues that the FLT H/H term should not determine whether Coastal was Rickmers's agent, the FLT H/H term helps define the roles of the parties involved, a relevant inquiry. *See Lake Charles Stevedores*, 199 F.3d at 226; *see also Akiyama Corp. of Am. v. M.V. Hanjin Marseilles*, 162 F.3d 571, 573 (9th Cir. 1998) (finding relevant "the nature of the services performed [by the stevedore] compared to the carriers [sic] responsibilities under the carriage contract" (citation and internal quotation marks omitted)). Additionally, in contradiction to Coastal's second point,

Coastal's GM testified that the invoice to Rickmers does not include the boiler unit "because it was never loaded on the vessel." And as to Coastal's fourth point, Rose testified that he did not instruct Coastal to turn the boiler around. Nor did Rickmers give "all instructions" because Coastal's operation manager also instructed his general manager that the loaded trailer should be moved in a straight line.

Finally, Coastal argues that Plaintiffs failed to establish that Coastal was acting as the shipper's agent rather than as Rickmers's agent. The burden, however, is upon Coastal to demonstrate that it is entitled to the COGSA package limitation. *See Servicios–Expoarma, C.A.*, 135 F.3d at 994. At best, Coastal has shown that the evidence in the record could weigh in its favor, but this Court cannot re-weigh evidence on appeal. *See Manderson*, 666 F.3d at 376–77.

Based upon our review of the evidence in the record as a whole, the district court's finding that Coastal was not under the control of Rickmers at the time of the accident is well within the realm of plausibility. Specifically, the district court plausibly found that Rose did not instruct Coastal on how to bring the lifting points closer to the vessel and that Rickmers's responsibilities did not begin until the cargo was on the hook, which never occurred. Indeed, because the boiler was never hooked and loaded, Coastal did not invoice Rickmers for those services. Accordingly, the district court did not commit clear error in its factual finding that Coastal was not acting as an agent of Rickmers at the time of the accident.

## C.

Coastal argues in the alternative that its liability should be limited by virtue of its terminal tariff, which also includes the COGSA package limitation. Its terminal tariff is a publically available document filed with the Federal Maritime Commission. Although the terminal tariff is not an actual contract

between Coastal and Rafinasi, Coastal posits that the terminal tariff forms an implied contract under 46 U.S.C. § 40501(f) and 46 C.F.R. § 525, and should thus limit its liability. The district court held that Coastal could not rely on its terminal tariff as an implied contract because Coastal had actual contracts with both Rafinasi and Rickmers. *See* 46 C.F.R. § 525.2 ("If the marine terminal operator has an actual contract with a party covering the services rendered by the marine terminal operator to that party, an existing terminal schedule covering those same services shall not be enforceable as an implied contract.").

Coastal argues that the district court clearly erred in finding that Coastal had an actual contract with Rafinasi. In support, Coastal contends that "[t]his Court can scour the record and find nothing even remotely resembling an actual contract between Costal and [Rafinasi or ATS]." Coastal is partially correct—the record contains no actual contract between Coastal and either Rafinasi or ATS.

Nevertheless, the district court's finding that a contract existed between Coastal and Rafinasi, through ATS, is plausible. The record contains, as the district court found, a dock receipt that Coastal issued to ATS for the boiler. The receipt contained the following provision: "Received the above described goods or packages subject to all the terms of the undersigned's regular form of dock receipt and bill [of] lading which shall constitute the contract under which the goods are received, copies of which are available from the carrier on request . . . ." Based on this provision, a contract between Coastal and Rafinasi, through ATS, plausibly existed even though the record does not contain an actual contract. Accordingly, we reject Coastal's alternative argument and affirm the district court's judgment.

## IV.

For the foregoing reasons, we AFFIRM the district court's judgment.