IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30494
_____


BP NORTH AMERICAN PETROLEUM,
a division of BP Exploration & Oil, Inc.

                                        Plaintiff-Appellant,

                        versus

SOLAR ST, her engines, tackle, boilers,
furniture, apparel, etc., in rem;
AHL SHIPPING COMPANY

                                        Defendants-Appellees.
_____

            Appeal from the United States District Court for the
                    Eastern District of Louisiana
_____

                        May 14, 2001

Before HILL,[*] JOLLY and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

    Defendant AHL Shipping Company ("AHL") contaminated a portion

of the oil cargo it transported for plaintiff BP North American

Petroleum ("BP") while discharging the fuel from its vessel, the

S/T SOLAR.  Following a bench trial, a damage award was ordered in

favor of BP.  BP appeals the amount of the award.  It argues that,

in ordering a modified "expected profit" award, the district court

_____

    [*]Circuit Judge of the Eleventh Circuit, sitting by
designation.

employed an improper formula in calculating damages. We agree and hold that the traditional measure of damages in damaged goods cases--the "market value" measure--should have been applied in this case. Because this formula was not utilized, we REMAND the case to the district court for a determination of damages using an estimated market value of the damaged oil on the discharge date.

I

We begin with the facts. BP owned a cargo of diesel oil and regular unleaded gasoline. AHL owned and operated the SOLAR. BP contracted to sell the oil to Colonial Oil for $0.62945 per gallon. AHL agreed to deliver the cargo from Corpus Christi, Texas, to the Colonial Oil Terminal in Savannah, Georgia. The cargo was uncontaminated when it was delivered to AHL and placed in the SOLAR on August 20-21, 1996.

Upon reaching Savannah, the SOLAR began discharging the diesel oil on August 25, 1996. During the discharging process, a portion of the diesel oil was contaminated with unleaded gasoline. The evidence later revealed that the contamination was the direct result of negligence on the part of AHL and the SOLAR.[1]

The market price of sound diesel on the day of contamination was $0.62039 per gallon. On September 10, 1996, about two weeks after the contamination, a Richmond slop reprocessor offered to purchase the contaminated oil from BP at a discount of $0.10 below

_____

[1]This appeal involves the issue of damages only. No party disputes the determination of liability.

market value, not including freight costs. Including freight, BP could have sold the contaminated fuel for $0.125 per gallon below the market price of sound oil. According to BP, it could not accept the offer because no transportation for delivery of the oil was available at that time.

On October 20, 1996, about seven weeks after the contamination, BP sold the contaminated oil for $0.62 per gallon. However, the market value of uncontaminated diesel oil had risen to $0.74539 per gallon since the original date of contamination. Therefore, during the time that BP held the contaminated oil, the price of oil had risen by about $0.125 per gallon.

Immediately after discovering that its cargo of diesel oil was contaminated, BP traded in the futures market in order to hedge against market price fluctuations in oil pending BP's disposition of the contaminated oil.[2] Specifically, BP sold futures contracts in the identical number of gallons of oil that had been contaminated in an attempt to "lock-in" the value of this oil pending disposition. The purpose of this transaction, of course,

---

[2]BP sold a quantity of October and November 1996 oil futures equal to the quantity of contaminated oil it possessed. The intention of BP, like all hedgers, was to protect itself against fluctuations in the price of oil pending its disposal of the contaminated oil. BP intended to "lift" its hedge as soon as it disposed of the contaminated oil by buying the same quantity on the futures market in the same futures month in which it had previously sold. In BP's case, if the price of oil on the cash market had fluctuated either up or down, the gain or loss to BP would have been offset by its corresponding loss or gain in the futures market.

was to prevent BP from losing money if the market price of oil had fallen before it could sell the contaminated shipment. However, because the market price rose by twenty percent, BP suffered a loss on these futures contracts equal to the change in the price of oil--$0.125 per gallon. At the same time, however, BP was able to take advantage of this increase in the price of oil by selling the contaminated oil for a higher price in October.

BP sued for damages and was awarded only the difference in the initial contract price for sound oil ($0.62945) minus the price BP eventually received seven weeks later for the contaminated oil ($0.62)--an award of only $0.009 per gallon. BP now appeals the district court's calculation of damages, contending that the district court neglected to calculate BP's actual losses by miscalculating the fair market value of the contaminated oil and, in the alternative, by failing to consider BP's losses in the futures market.

II

A

As we have just noted, the district court calculated BP's loss by subtracting the profit BP eventually received for the polluted oil from the profit BP would have received under its original Colonial contract. Stating that "the goal is to place the injured cargo owner in the same position it was in before the damage," the court found that BP was not required to "speculate" in the futures market as a result of the oil contamination, and refused to award

4

BP additional damages. In essence, the district court awarded BP damages based on its profit expectations at the time it made the contract, ignoring the fact that oil prices had risen dramatically between the time BP's oil was contaminated and the time BP eventually sold the polluted oil; the district court further ignored BP's losses in the futures market.

BP argues that the district court, in assessing damages, should have calculated the difference between the market value of the sound oil and the market value of the polluted oil at the date of discharge, instead of using the price at which BP actually sold the contaminated oil seven weeks later. Because the price of oil rose twenty percent over those seven weeks, the price at which BP eventually sold the contaminated oil was almost equal to the price of sound oil at the time of discharge. In the alternative, BP contends that it should be reimbursed for its futures losses and not be punished for attempting to hedge its position by trading on the futures market. It argues that the district court misunderstood the nature of "hedging," consistently referring to BP's activities as "speculation." BP says it did nothing more than protect itself from price fluctuations, and in doing so prevented itself from both taking a loss or making a profit.

AHL, in turn, argues that the district court's calculation was correct because there was no market for contaminated oil at the time of discharge, and it is therefore difficult to calculate the price of polluted oil at that time. AHL contends that the district

5

court's use of the price that BP eventually received for the contaminated oil was a reasonable means of determining BP's loss at the time of discharge. AHL further asserts that, had BP not engaged in futures trading, it would have been placed in the same position it was in before the contamination. AHL argues that it should not be forced to pay for BP's losses in the futures market.

B

Both parties argue the issue of BP's losses in the commodity futures market, with AHL arguing that these losses are unrecoverable and BP asserting that it should be compensated for those losses because they are legitimate related losses inasmuch as hedging is an acceptable form of risk reduction for an oil producer. The district court disagreed with BP, finding that its futures trading was "speculation" and concluding that "BP was not required to speculate in the futures market as a result of the contamination." The court reasoned:

> In engaging in speculation in the oil futures market, BP was taking a chance in the hopes of recouping a profit. Had the market moved in the other direction, it would certainly not have offered to pay its futures market profits to AHL.

The district court's characterization of BP's futures trading was somewhat inaccurate, and this mischaracterization was the starting point from which the court jettisoned the traditional method of calculating damages in damaged cargo cases and awarded damages based on a more ad hoc calculation of BP's expected

6

profits.  First, BP was a hedger in the futures market, not a

speculator, as the district court asserted in its opinion.[3] BP's

actions were designed only to protect itself from financial loss

after AHL contaminated the diesel oil.  Had BP not hedged its

position, and the price of oil had <u>dropped</u> twenty percent pending

disposition, BP would have lost considerable money by retaining the

---

[3]There are two distinct classes of players in the futures market.  Hedgers are interested in the commodities themselves. They can be producers, like oil drillers, or users, like BP (an oil distributor).  Hedgers are interested in protecting themselves against price changes that will undercut their profit.

Speculators, on the other hand, trade futures strictly to make money in the futures market itself.  A futures trader that <u>never uses the commodity itself</u> is a speculator.  Speculators buy and sell contracts, depending on which way they think the market will fluctuate.

This characterization of the futures market has been accepted by the Supreme Court.  In <u>Merrill Lynch v. Leist</u>, 456 U.S. 353 (1982), the Court outlined the difference between "hedging" and "speculating" in the futures market, and extolled the benefits of the futures market to producers and processors (like BP):

> Those who actually are interested in selling or buying the commodity are described as 'hedgers'; their primary financial interest is in the profit to be earned from the production or processing of the commodity. . . . A farmer who takes a 'short' position in the futures market is protected against a price decline; a processor who takes a 'long' position is protected against a price increase. Such 'hedging' is facilitated by the availability of speculators willing to assume the market risk that the hedging farmer or processor wants to avoid.

<u>Id.</u> at 358-59.  <u>See</u> <u>also</u> <u>Allenberg Cotton Company v. Pittman</u>, 419 U.S. 20, 27-28 (1974) (citing a House Report, H.R. Rep. No. 93-963, p. 2-4 (1974), for the proposition that commodity hedging is a legitimate business activity); <u>Volkart Bros., Inc. v. Freeman</u>, 311 F.2d 52, 54-55 (5th Cir. 1962) (noting that "[a] futures exchange performs a valuable economic function in the public interest").

Therefore, the district court was incorrect insofar as it described BP's activities as "speculation."  Hedging, like insurance, is a method of risk aversion, not risk assumption.

7

oil while the price fell.  As a hedger, BP could not have "profited" from its futures trading, as the district court suggests, in the sense that any money made in futures trading would have been offset by an equivalent fall in the price BP received for the contaminated oil on the date of disposal.

Although the district court mischaracterized the hedging activity by BP and the relevance of those futures transactions to a damages calculation here, BP is also mistaken in its argument that it must be compensated for futures losses.  Indeed, we think that under established law, BP's futures trading is irrelevant to a proper calculation of damages in this case.  We turn now to discuss the proper method of calculating damages in diminution of cargo value cases--the traditional "market value" rule.

C

We think that the law in this circuit is settled: The traditional "market value rule" should be applied when calculating damages for spoiled cargo in carrier cases.  See Minerais U.S. Inc. v. M/V MOSLAVINA, 46 F.3d 501, 502 (5th Cir. 1995) (finding that "where cargo is downgraded but not completely destroyed, this Court has held the market-value rule to be both a convenient and accurate means of measuring damages").  This rule "requires that damages be calculated using market values at the time the cargo is discharged."  Id.

Damages awarded under the market value rule are normally computed by utilizing "the difference between the market value of

8

the cargo in the condition in which it would have arrived had the carrier performed properly, and the cargo's market value in its damaged state on arrival at port of destination." Cook Industries, Inc. v. Barge UM-308, 622 F.2d 851, 854 (5th Cir. 1980) (emphasis added). The district court took a different approach in calculating BP's damages, relying on Illinois Central v. Crail, 281 U.S. 57 (1930). In that case, the Supreme Court held that "[t]he test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if for special reasons, it is not exact or otherwise not applicable." Id. at 64-65. Citing Illinois Central, and citing Minerais for the proposition that "[t]he goal is to place the injured cargo owner in the same position it was in before the damage," the district court rejected the market value rule and calculated damages based on the price BP eventually received for the contaminated oil. As we have noted, the district court also rejected BP's claim that its futures losses were legitimate and compensable.

We think that the district court erred in the method of calculating damages in this case, and that the court's reliance on Illinois Central to reject an application of the market value rule was misplaced. In Illinois Central, the rail carrier of the plaintiff's coal cargo arrived at the delivery point with a shortage of 5,500 pounds of coal. At the time of delivery, the purchaser of the coal had not contracted to sell any of the coal

9

and intended to simply add the coal to his current stock. The plaintiff sued, arguing that the market value rule required that he be awarded the $13 per ton retail value of the undelivered coal. Noting that the plaintiff purchaser "lost no sales by reason of [the delivery shortage]," and finding that he could have purchased like coal at the $5.50 per ton wholesale price, the court awarded damages based on the wholesale market price. Thus, the question in Illinois Central was not whether the market value rule would be applied, but which market value would be utilized in the calculation--the wholesale market or the retail market. Reading that case as a whole, therefore, Illinois Central does not undermine the validity of the market value rule--the court in that case only decided to compensate the plaintiff based on the wholesale market price of coal instead of the retail market price, finding that "[i]t is not denied that a recovery measured by the wholesale market price of the coal would fully compensate the respondent, or that the retail price . . . includes costs of delivery to retail consumers which respondent did not incur, and a retail profit which he had not earned by any contract of resale." Id. at 63. We also note that later Fifth Circuit cases have explicitly rejected Illinois Central's more ad hoc approach to the market value calculation in cases where goods set for resale are damaged by a seller or carrier. See Minerais, 46 F.3d at 502 ("Illinois Central was a shortage-in-delivery case, not a damaged-

goods case"); <u>Cook Industries</u>, 622 F.2d at 856 (rejecting application of <u>Illinois Central</u> in this damaged-goods case).

Assuming the district court's reliance on <u>Illinois Central</u> in rejecting the market value rule was misplaced, AHL argues that applying the market value rule as it was applied in <u>Minerais</u> demonstrates that the price BP received for the contaminated oil seven weeks after the date of contamination could properly be used as a reasonable estimation of the market value of the oil on the date of discharge. In <u>Minerais</u>, the cargo owner had sold the damaged goods between two and eight weeks after the discharge date, and the court, in calculating the fair market value of the cargo, held that "the sales price close in time to the discharge date is nevertheless sufficient to establish the market value of the downgraded product at the time of discharge." <u>Id.</u> AHL argues, therefore, that the district court's use of the price at which BP sold its contaminated oil seven weeks after the discharge date, subtracted from the contract price BP expected to receive for the oil, was an acceptable damages calculation under <u>Minerais</u>. However, the court in <u>Minerais</u> specifically noted that the market price of high grade ferrochrome (the cargo in <u>Minerais</u>) had changed very little between the discharge date and the disposal date. <u>Id.</u> at 502-03. Moreover, the cargo owner had sold the damaged goods in multiple sales, beginning as early as one or two weeks after the discharge date. The court found that, because several of those sales over a month-long period valued the damaged material at \$0.99

11

per pound, "[t]hese contemporaneous sales provide sufficient evidence from which to apply the market-value rule." Id. at 503. Thus, although the price of the cargo in Minerais evidently fluctuated over the period the cargo owner possessed the goods, those fluctuations were nothing like the clearly identifiable twenty percent rise in oil prices seen in BP's case. Moreover, the district court here was presented with evidence of the value of the contaminated oil that is more contemporaneous to the discharge date than the price BP received on the date of disposal, including the price BP was offered in September 1996 for the contaminated oil ($0.12 below market price).

The market value rule clearly requires courts to compensate based on the value of the damaged goods "at the time of discharge," which in this case was August 25, 1996. Minerais, 46 F.3d at 503. The price of oil rose twenty percent between the date of discharge and the date of disposal in this case. Therefore, we cannot accept AHL's claim that the price BP received for the contaminated oil on October 20 is an accurate measure of the value of the contaminated oil seven weeks earlier, following a twenty percent rise in oil prices. Indeed, the price BP eventually received for the contaminated oil was virtually identical to the value of uncontaminated oil on the date of discharge (a difference of only

12

$0.009), while the record contains evidence that the polluted oil was valued at approximately $0.12 less than uncontaminated oil.[4]

As we have noted, because of the applicability of the market value rule to this case, any futures trading by BP following the date of discharge does not affect a proper damages calculation. Because the market value rule considers the diminished value of the cargo on the date of discharge, later price fluctuations or changes in value beyond the date of discharge are irrelevant to the damages calculation. This principle was stated about as well as it can be said in 1878 by a California district court in The Compta, 6 F.Cas. 233, 234 (D. Cal. 1878)(No. 3070):

> Where goods are delivered in a damaged condition, the damage sustained is the difference between their market value, if sound, and their market value in their unsound condition. Both values to be ascertained as of the time when the goods were, or should have been, delivered. . . . If the shipper has seen fit to hold the goods for a better market, he has entered into a speculation the result of which can in no way affect the liability of the ship. If he has obtained a higher price than could have been realized at the time of the breach, the ship's liability is not thereby diminished. If he has sold them at a lower price, her liability is not increased.

In sum, BP's futures trading is inapposite to a "market value" damages calculation in this case, and BP's damages should be calculated as the difference between the market value of sound oil

---

[4]The two offers BP received to buy the contaminated cargo both valued the polluted oil at between $0.10 and $0.12 less than the value of sound oil. Indeed, BP sold the contaminated oil in October 1996 for $0.62 per gallon--$0.12 less than the $0.74539 market value of sound oil at that time.

on the date of discharge and an estimated valuation of the contaminated oil on the date of discharge.[5]

III

To sum up, we hold that the district court erred in its damages calculation in this case by failing to apply the market value rule.[6] Indeed, the appropriateness of the market value rule is illustrated in this case, where BP understood that it needed to protect itself from further financial loss as soon as the oil cargo was contaminated and the damage was realized. In this way, the market value rule provides much-needed assurance to parties

---

[5]BP argues that its damages should be calculated using the contract price for which it was planning to sell the oil instead of the market value of the oil on the date of discharge. The record reveals that the contract price BP had with Colonial Oil was slightly higher than the market price of oil on the date of discharge. However, this contract price is irrelevant to any calculation of damages against AHL. AHL was obligated to deliver the oil from Corpus Christi to Savannah. Under Minerais, BP's damages arising from AHL's negligence are properly measured as the difference between the market value and contaminated value of the oil on that date. The BP/Colonial contract price is irrelevant because BP could have purchased oil at market price on the date of discharge and sold it to Colonial at the higher price pursuant to its original contract.

[6]As a final matter, AHL argues that, under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300-1315, BP can only recover "for the amount of damages actually sustained." § 1304(5). AHL asserts that BP cannot recover for losses in the futures market, because those losses were not actually caused by the defendant. BP responds that this court has defined "damage actually sustained" to mean "damage computed on the basis of the fair market value of the goods at destination as of the date of arrival." Holden v. S/S KENDALL FISH, 262 F.Supp. 862, 863 (E.D. La. 1968), aff'd 395 F.2d 910, 912 (5th Cir. 1968).

As described above, BP is not being reimbursed for its futures losses--its reimbursement is for its actual loss, as measured from the date of discharge by the market value reimbursement rule.

involved in transactions gone awry as to compensation for any damages inflicted.

Because the court had evidence before it indicating an estimated value of the contaminated oil on the date of discharge, the court erred when it calculated damages based upon the price BP received for the contaminated oil seven weeks after contamination-- after the price of oil had risen twenty percent. Because we can find no undisputed evidence in the record establishing the market value of contaminated oil on the date of discharge, we leave it to the district court to determine the value of BP's polluted oil on the discharge date.[7] The damages award should be the difference between this estimated value of the contaminated oil and the market value of sound oil on that date. The case is therefore REMANDED for a calculation of damages and any other necessary proceedings that are not inconsistent with this opinion.

R E M A N D E D

---

[7]Although the record contains evidence that the contaminated oil was valued at approximately $0.10 to $0.12 less than sound oil, the district court should make a reasonable estimation of this value based on the entirety of the evidence presented by the parties.

15